## THOMAS *v.* TOWN OF LANSING.

*(Circuit Court, N. D. New York. September 6, 1882.*

1. **TOWN BONDS IN AID OF RAILROADS—POWER TO ISSUE.**

    Where an act of the state legislature provided that any town, village, or city in any county through or near which a certain railroad or its branches may be located, except such counties, towns, and cities as are excepted from the provisions of the general bonding law, may aid or facilitate the construction of the said railroad, *held,* in an action on coupons from bonds issued by a town in aid of an extension of such railroad, that the location of the route of the whole extension must be made by the board of directors of the road, and the two *termini* fixed and ascertained pursuant to law, before a town was empowered to issue bonds in aid of its construction.

2. **SAME—DESIGNATION OF ROUTE.**

    Where the determination of the question of location of the route and *termini* of the extension had been confided to the board of directors of the railroad extension by the statute authorizing the construction of the road, it was not the province of the town commissioners to determine it; and, although the county judge could designate the commissioners who should issue the bonds, yet he could not designate the municipality, nor could he designate the commissioners until after the board of directors had designated the municipality

3. SAME—BONA FIDE PURCHASER NOT PROTECTED.

Where a town had no power to issue bonds in aid of a railroad extension, there can be no protection of the holder of such bonds as an innocent purchaser, and no ratification of a power that never existed can aid him, although the bonds are regular on their face and recite that they are issued "under the provisions" of an act of the legislature, and specify the act, and although he took them otherwise *bona fide.*

Motion for a New Trial.

*James R. Cox* and *Sprague, Milburn & Sprague,* for plaintiff.

*H. L. Comstock* and *Hurlbut & Underwood,* for defendant.

BLATCHFORD, Justice.   This is a motion for a new trial.   The case was tried by the court without a jury, and, on the findings of fact, a judgment was ordered for the defendant.   11 FED. REP. 829.

The question on which the case turns is as to the power of the town to issue the bonds.   The power, if it existed, arises out of the provisions of section 1 of the act of the legislature of the state of New York passed April 5, 1871, (Laws New York, 1871, vol. 1, c. 298, p. 586,) which enacts as follows: "The New York & Oswego Midland Railroad Company are hereby authorized and empowered to extend and construct their railroad from the city of Auburn, or from any point on said road easterly or southerly from said city, upon such route and location, and through such counties, as the board of directors of said company shall deem most feasible and favorable for the construction of said railroad, to any point on Lake Erie or the Niagara river."   Then follow provisions for constructing other branches.   Then follows this: "And any town, village, or city in any county through or near which said railroad or its branches may be located, except such counties, towns, and cities as are excepted from the provisions of the general bonding law, may aid or facilitate the construction of the said New York & Oswego Midland Railroad, and its branches and extensions, by the issue and sale of its bonds in the manner provided for" in the act of April 5, 1866, (Laws of New York, 1866, vol. 1, c. 398, p. 874,) and the acts "amendatory of and supplementary thereto."   The manner so provided for is the appointment, by the county judge of the county in which the town is situated, of not more than three commissioners to carry into effect the purposes of the act.   The commissioners are to execute the bonds under their hands and seals, and to issue them.   When issued lawfully, they become the obligations of the town, and bonds issued by the town.

The bonds in the present case state on their face that they are obligations of the town, and that they are "issued under the provisions" of the said act of 1866, and "the several acts amendatory

thereof and supplementary thereto," especially the said act of 1871. They are dated December 1, 1871, and purport to be attested by the hands and seals of three persons as "duly-appointed commissioners of said town of Lansing;" and the bonds state that the commissioners have caused each of the annexed coupons to be signed by one of their number. This suit is on coupons amounting to $3,220, cut from bonds, the principal of which amounts to $7,500.

The commissioners were appointed October 21, 1871, by the county judge of Tompkins county, and took the oath of office on the first of November, 1871. On the sixteenth of November, 1871, the board of directors of the railroad company passed the following resolutions:

"Whereas, the New York and Oswego Midland Railroad Company had for its original object the construction of a railway from the city of New York to the city of Oswego; and whereas, since the organization of said railway company it has become desirable to extend their said railroad to Lake Erie, or the Niagara river; and whereas, the legislature of the state of New York did, by chapter 298 of the Laws of 1871, authorize and empower the said New York and Oswego Midland Railroad Company to build and extend their said railroad from the city of Auburn, or from any point easterly or southerly of said city, to any point on Lake Erie or the Niagara river; and whereas, the said railroad company and its board of directors have decided to begin such extension and construction of said railroad westerly at and from the village of Cortland, in the county of Cortland, and westerly to Lake Erie or the Niagara river; therefore, be it

"Resolved, that the board of directors of said railroad company hereby determine that the construction and extension of the said railroad westerly commence at and from the village of Cortland, in the said county of Cortland, and thence to Lake Erie or the Niagara river."

On the same day the board of directors of said company passed the following resolution:

"Resolved, that the said New York and Oswego Midland Railroad Company, for the purpose of obtaining money and materials necessary to extend their said railroad from the village of Cortland to Lake Erie or the Niagara river, hereby authorizes and directs its president and treasurer to borrow money to an amount not exceeding $25,000 per mile in length of the track of the said railroad, so as aforesaid to be extended and constructed, and, to secure the repayment thereof, to issue its first-mortgage bonds, to be made payable in gold coin of the United States, and to be of such denomination, and after such manner and form, and to such trustees, as the said president may determine upon, and deem best for the interest of the said company."

It is not shown that the board of directors of the company ever passed any resolutions except the foregoing, or took any action as such board, except what is contained in the foregoing resolutions, in

respect to said extension, until after the bonds involved in this suit were issued.

On the first of January, 1871, the executive committee of the company had purchased a railroad road-bed called the Murdock line, 16 miles long, with its franchises and right of way, which had been graded in 1852, and part of which was ready for ties and ballasting, the grading, however, being grassed over and the culverts decayed. It ran from a place called Osmun's, in the town of Lansing, northward, to the north line of that town, which is the north line of Tompkins county and the south line of Cayuga county, and then on through the towns of Genoa and Venice, in Cayuga county, into the town of Scipio, in that county. During the fall and summer of 1871 the company made surveys for a line of railroad, to run from Freeville, in the town of Dryden, Tompkins county, (the town next north of Lansing,) northward to Osmun's, a distance of 10 miles. The grading and making of the railroad from Freeville, north, through the town of Lansing, was begun in December, 1871. On December 13, 1871, a map called "Map No. 1," certified by the directors of the company, was filed in the office of the clerk of Tompkins county, containing this inscription: "Map and profile of a part of the Auburn branch of the New York and Oswego Midland Railroad, as located in and through a part of the county of Tompkins, New York." This map covered the 10 miles from Freeville to Osmun's. On the twenty-second of December, 1871, there was filed in the same office a map similarly certified and inscribed, called "Map No. 2," and covering the Murdock line from Osmun's to the north line of the town of Lansing. On the twenty-third of December, 1871, there was filed in the office of the clerk of Cayuga county a map similarly certified, called "Map 1," containing this inscription: "Map and profile of a part of the Auburn branch of the New York and Oswego Midland Railroad, as located in and through a part of the county of Cayuga, New York," and covering the Murdock line from the north line of the town of Lansing, through the towns of Genoa and Venice, to the south line of Scipio. On the thirty-first of January, 1872, $15,000 of bonds were issued, and in August, 1872, $60,000 were issued. No more were ever issued. When the bonds involved in this suit were issued does not appear. In exchange for said bonds the commissioners received a certificate for 750 shares of the capital stock of the railroad company, of $100 each, in the name and on behalf of the town of Lansing. On the thirtieth of May, 1872, there was filed in the office of the clerk

of Cayuga county a map called "Map No. 2," certified by the said directors, containing the same inscription as the said "Map 1," and covering the Murdock line from the south line of Scipio to the Merrifield road, in Scipio, which was the north end of the Murdock line. The Utica, Ithaca and Elmira Railroad Company owned a railroad which was running from the village of Cortland to the village of Freeville, west from Cortland, a distance of about 10 miles. Under a contract or arrangement between that company and the Midland Company, the latter began, in the fall of 1872, to run its own cars from Cortland to Freeville, and then on its own road from Freeville to Scipio, 26 miles, the latter road having been completed. The terminus in Scipio was 11 miles from Auburn, in a farming community, and was never connected with any other road until 1881, when it was finished to Auburn by another company. On the twenty-ninth of January, 1873, the following proceedings took place at a meeting of the board of directors of the Midland Company: "The president presented the contract made by the executive committee with Charles P. Wood, of Auburn, dated January 1, 1871, for the road-bed and franchises known as the Murdock line. On being read and discussed J. W. Merchant offered the following:

'Resolved, that the contract made by D. C. Littlejohn, J. W. Merchant, John R. Clark, Cheney Ames, and William Foster, as the executive committee, and Charles P. Wood, of Auburn, for the purchase of the franchises, right of way, and road-bed known as the Murdock line, be and the same is hereby approved, ratified, and confirmed. Resolved, that the action of the president in locating and constructing the western extension of this company's road over and upon the said Murdock line be and the same hereby is approved.' Unanimously adopted."

The persons named were all or a majority of the executive committee. On the twenty-ninth of August, 1873, there was filed in the office of the clerk of Cayuga county a map called "Map 3," certified by the said directors, containing this inscription: "Map and profile of a part of the western extension of the New York and Oswego Midland Railroad, as located in and through a part of the county of Cayuga," and covering a line from the said Merrifield road to Mud Lock, a point in Cayuga county 10 miles northwest of Auburn, on the eastern line of Seneca county, the county next west of Cayuga county, and about 50 miles from Freeville. The company continued its efforts after the fall of 1872 to extend its railroad westward, until, embarrassed by the financial troubles of 1873, it failed and discontinued operations, and its property passed into the hands of a receiver,

from which condition it has never recovered. It never located or built any line of road of its own between Cortland and Freeville. The $75,000 of bonds were delivered by the commissioners to Charles P. Wood, the assistant treasurer of the company. The plaintiff became a *bona fide* purchaser of the $7,500 of bonds, and of the coupons thereon which are in suit. The commissioners paid the interest which became due on all of the bonds on September 1, 1872, being the first installment, and nearly all which became due on them on March 1, 1873, and September 1, 1873, having received the money to do so from the collector and supervisor of the town of Lansing, collected in the usual manner, as provided by said acts, but since that time they have not paid any more, nor have any funds been provided for that purpose. They have retained the certificate of stock. On the foregoing facts it was held—

(1) That the statutes prior to the act of 1871 conferred no power to issue the bonds, because the counties through which the branch road to Auburn was to run, as provided by acts passed in 1867 and 1869, were named in the statute, and Tompkins was not one of them, and such branch road was not to pass through or near the town of Lansing; (2) that, under the act of 1871, no power was conferred on any town to issue bonds in aid of the Midland Company until the whole of the western extension provided for in that act should be located by some definite action by the company, and, irrespective of the said maps and profiles, there remained about 140 miles more to be located between Mud Lock and Buffalo or the Niagara river, which, so far as appeared, was never located at all; (3) that payment of the interest, and receiving and retaining the certificate of stock, might be a ratification of steps in regard to which merely irregularity was claimed, but could not avail to prevent the town from setting up a total want of power to issue the bonds.

Taking all the provisions of the act of 1871 together, it seems to be very plain, that the legislature, instead of designating any county or town from which the western extension was to start, or any counties or towns through which its route should lie, or any county or town which should be its western terminus, left all those matters open to be determined by the board of directors of the company, and required the board to determine all those matters, and to determine them by certain prescribed principles. It required the board, if it should construct the extension, to first determine what route it should deem most feasible and favorable for the construction of the whole extension, the starting point, the route, and the western terminus being all left to depend on what was most feasible and favorable. A choice was given to start from Auburn, or from any point on the existing road easterly or southerly from Auburn, and to end at any point on

Lake Erie or the Niagara river. This gave an option over a wide extent of country from north to south. Even adopting the village of Cortland as the eastern starting point did the same. If the branch should be located through Tompkins county without reference to any route beyond Tompkins county in either direction, it might well be that thereafter, with a view to the rest of the route, a route through Tompkins county would not be at all a feasible or favorable route, in the judgment of the board, for reaching Lake Erie or the Niagara river, and that a location abandoning Tompkins county and abandoning even a starting at the village of Cortland would have to be resorted to, involving a starting point, a route, and a western terminus in respect to which it could not fairly be said that Tompkins was a county near the road, and which would be such that the requisite number of tax-payers would never consent to bond the town to aid in constructing the branch. The resolution of November 16, 1871, merely fixed the eastern point. The board of directors were to determine not only that matter, but also the most feasible and favorable route for reaching such western terminus as they should select as most feasible and favorable. The resolution was incomplete. It was a snare and a delusion. The expression "may be located," in the clause in the statute giving power to towns to aid the construction of the extension, has reference to the word "location" in the first clause of the same section. It means "may have been located in a location of the route of the whole extension." There was nothing in any of the maps filed in either Tompkins county or Cayuga county before the bonds were issued, which indicated that the board of directors intended the road between Freeville and the Merrifield road in Scipio to be a part of the western extension. It was called, in all of those maps, "the Auburn branch," and was so called by the directors, by their certificate on each map. It was not the Auburn branch or the branch to Auburn authorized by the acts of 1867 and 1869 to be made through the counties of Chenango, Madison, Cortland, and Cayuga. It was, in fact, a branch without authority of law. The idea of regarding the Murdock line as a part of the western extension does not, so far as appears from anything shown, seem to have been entertained by the board of directors until January 29, 1873, when the resolution of that date was passed. The map filed in Cayuga county August 29, 1873, called the continuation from the Merrifield road to Mud Lock a part of the western extension. But there is nothing of record showing that the 10 miles from Freeville to the Murdock line was ever called by the board of directors a part of the western extension. The case

is one of the absence of legislative authority, because there was no designation of Tompkins county, either directly by name in the statute, or by any delegated authority, as a county the towns in which could issue bonds in aid of the western extension. Every one taking the bonds was notified by the face of them of the act of 1871. Even a *bona fide* purchaser of them was referred to the source of authority. It was not found directly in the statute, and he was remitted by that to the action of the "board of directors" as to the counties through which the route and location of the road were to be fixed. The foregoing views, as to the proper construction of the act of 1871, are those which were held by the court of appeals of New York in *People* v. *Morgan*, 55 N. Y. 587. The case stands as if there were no act, or as if the act provided that it should not take effect until the happening of an event which had not yet happened.

But the question arises whether, in view of the recitals in the bonds, which recitals were made by the commissioners as officers of the town, and of the fact that plaintiff is a *bona fide* holder of the bonds and coupons, and of the payment of the interest, and of the retention of the stock certificate, or of all or any of these circumstances, the town is estopped from asserting that the board of directors of the company never took the action made necessary by the act to fix the route and location of the branch.

It is contended for the plaintiff that the ascertainment of the facts conferring power on the town to issue the bonds was confided by law to the commissioners who issued them; that the bonds are regular on their face, and recite that they are issued "under the provisions" of the act of 1871; that that is a declaration by the commissioners, in the bonds, that the route and location of the road were fixed by the board of directors in such manner that the town had the right, under some circumstances, to issue the bonds; and that, therefore, they are valid in the hands of a *bona fide* holder of them. It is also urged, that whenever the company has constructed any railroad which might be a part of a road provided for by the act of 1871, the presumption, in a collateral suit like the present, is, that it has been lawfully built, and that all the proper steps legally necessary for its construction have been taken; that the word "location," in the act, is a synonym for the word "place;" that, when a road has been built or acquired upon any route or location, the presumption is that such route or location has been deemed most feasible and favorable for its construction; that it is sufficient if the court finds the company constructing, occupying,

or operating such portion of a road as is through or near the town of Lansing; that the purchaser of the bonds is only required to ascertain that a branch or extension of the road is in fact situated or placed through or near the town which issues the bonds; that it is enough if the road is found constructed through or near the town of Lansing, between a point east or south of Auburn and a point on Lake Erie or the Niagara river, on any possible route between those points; that it was for the town of Lansing to decide whether the road in question was located through it, or sufficiently near to it to justify the issue of the bonds; that it made that decision affirmatively, and announced it by declaring on the face of the bonds that they were issued "under the provisions" of the acts referred to in the bonds; and that the town is, therefore, estopped, as against a *bona fide* purchaser of the bonds, from asserting that there was not a sufficient "location," under the statute.

The case is sought to be brought within those numerous cases in the Supreme Court of the United States, where, the legal power being sufficiently comprehensive, the *bona fide* holder has a right to presume, from the recitals in the bonds, and the fact of their issue by the officers charged with the duty of issuing them, that all precedent requirements prescribed by law have been observed. But, in those cases, the municipality was designated by name in the statute, or all the towns in certain designated counties were authorized to issue bonds, or the authority was given to all the towns on or near a route which had been designated by some record, or there was something equivalent to such a designation of the municipality. In the present case, however, on all the facts existing when these bonds were issued, the power to issue bonds in aid of this road, under the act of 1871, might as well have been exercised by any town, village, or city in the state west of Auburn, or west of any point on the road of the company easterly or southerly from Auburn, as by the town of Lansing. Certainly, the legislature did not, in the act of 1871, use language indicating such an intention. It clearly, by the language it used, intended to have the two *termini*, and the route and location of the road, determined by the board of directors with a view to what was most feasible and favorable for its construction, before the taxpayers of the town could be called upon to act on the question of consent to bonding the town. The determination of this question being confided to the directors, it was not the province of the commissioners or of any one else to determine it. The question in issue in this suit is not as to the regularity of the exercise of

a power plainly conferred on, and capable of being exercised by, the commissioners of this town. The county judge could designate the commissioners, but he could not designate the municipality. He could designate the commissioners only after the board of directors had designated the municipality. No certificate by the commissioners that the board of directors had designated the municipality could make such designation a fact, when it was not a fact. Every taker of the bonds had notice from them that the act required the designation by the board of directors, and, if there was no such designation in fact, there was none as to such taker, though he took otherwise *bona fide*, and the absence of such designation was the absence of power in the town to issue the bonds under any circumstances.

The present case falls within the principles adjuged in *Marsh* v. *Fulton Co.* 10 Wall. 676, because the power of the town to contract never existed. In such a case there can be no protection of the holder as an innocent purchaser, and no ratification of a power which never existed, by such alleged acts of ratification as are shown in this case. *East Oakland* v. *Skinner*, 94 U. S. 255, 258; *South Ottawa* v. *Perkins*, Id. 260, 269; *McClure* v. *Oxford*, Id. 429; *Ogden* v. *Daviess Co.* 102 U. S. 634, 641; *Buchanan* v. *Litchfield*, Id. 278.

The plaintiff can derive no aid from the fact that the decision of the supreme court of New York in the case which the court of appeals decided in 55 N. Y. was contrary to that of the latter court. The decision of the supreme court of New York was an appealable decision, and was appealed and reversed. All persons who relied on the decision by the supreme court of New York took the risk of a decision the other way, on appeal, in the same suit.

It results from the foregoing considerations, that the motion for a new trial must be denied, and the same decision is made in the case of Mellen against the same defendant.